UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WALTER ZEROD and ELGIE ZEROD,

        Plaintiffs,

                                  Case Number 03-10098-BC

v.                                    Honorable David M. Lawson

CITY OF BAY CITY, DANIEL GARIGEN,
CORPORAL PATRICK LOCHINSKI,
OFFICER RICHARD ROBERTS, OFFICER
JENNIFER KORY, and OFFICER
MARK SEWARD,

        Defendants.

_____/

**ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION, OVERRULING PLAINTIFFS' OBJECTIONS,
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DISMISSING PLAINTIFFS' FEDERAL CLAIMS WITH PREJUDICE,
AND DISMISSING STATE LAW CLAIMS WITHOUT PREJUDICE**

A City of Bay City ordinance prohibits the storage of "disabled vehicles" on the back and side lots of residential property for more than ten days. The plaintiffs were prosecuted for violating this ordinance and fined $50 each after conviction following a bench trial in State court. The plaintiffs now claim that the ordinance is unconstitutional and the defendants violated the Fourth Amendment in the way they gathered evidence against the plaintiffs. The defendants moved to dismiss the plaintiffs' action filed under 42 U.S.C. § 1983. Magistrate Judge Charles E. Binder, acting on an order of reference from this Court, treated the motion as one for summary judgment and recommended that it be granted. After considering timely-filed objections by the plaintiffs and conducting a *de novo* review, the Court agrees. The defendants' motion will be granted, and the case will be dismissed.

I.

The facts of the case are set forth in the magistrate judge's report. Neither party takes issue with that portion of the report. The Court finds that the magistrate judge's recitation faithfully tracks the record as presented to him by the parties, and therefore the Court adopts it here.

To summarize, however, plaintiffs Walter and Elgie Zerod were told by the City of Bay City to remove, repair, or license three motor vehicles they kept in a lot adjoining their property because the motor vehicles, the City charged, were a nuisance under the Bay City Code of Ordinances. The plaintiffs refused, and ultimately the City issued them citations. The plaintiffs challenged the citations in the Bay County, Michigan district court. They were found guilty on July 17, 2003 following a bench trial and fined. Prior to trial, the plaintiffs, acting *pro se,* also filed suit in this Court under 42 U.S.C. § 1983 challenging the constitutionality of the events surrounding the issuance of the citations. They claim that Article IX, Chapter 74 of the Bay City Code of Ordinances is unconstitutional on its face and as applied to them on several theories, and the defendants violated their Fourth Amendment rights when they trespassed onto their property, obtained the vehicles' vehicle identification number (VIN), and affixed tags to the cars. Thereafter, the defendants moved to dismiss or for summary judgment. The plaintiffs filed a response in opposition.

II.

The magistrate judge properly considered the motion under Federal Rule of Civil Procedure 56 rather than under Rule 12. The purpose of a motion under Rule 12(b)(6) is to test the legal sufficiency of the complaint, not the probability of success on the merits. *See Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005). In considering

-2-

a motion to dismiss under Rule 12(b)(6), the allegations in the complaint are taken as true and are viewed in the light most favorable to the non-moving party. *Herrada v. City of Detroit,* 275 F.3d 553, 556 (6th Cir. 2001). However, if matters outside the pleadings must be considered in ruling on the merits of the claim, as here, the motion more properly should follow the standards and procedures of Rule 56, and reviewing courts generally will treat the motion as one for summary judgment. Fed. R. Civ. P. 12(b); *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002) (quoting *Soper v. Hoben*, 195 F.3d 845, 850 (6th Cir.1999)). Both parties have made references in their motion briefs to their respective affidavits and to a state court trial transcript. The Court believes, therefore, that magistrate judge correctly adjudicated the defendants' motion under Rule 56 and will conduct its review of the report and recommendation in light of the well-established summary judgment standards, which were described adequately by the magistrate judge.

### A.

The plaintiffs acknowledge that the magistrate judge considered their arguments that the ordinance was unconstitutional on its face and as applied, but they object because the magistrate judge did not address the contention in the complaint that the ordinance was unconstitutional "as construed." By this, it appears that the plaintiffs contend that the ordinance was arbitrarily enforced; they attached photographs that depict a van with flat tires parked on the street and argue that no citation or tow order was issued for that vehicle, but the plaintiffs were prosecuted for the unlicensed cars parked on their lots.

"It is axiomatic that the Equal Protection Clause protects citizens from [arbitrary] police action" including the selective enforcement of municipal ordinances based on discriminatory

-3-

animus. *Bennett v. City of Eastpointe,* 410 F.3d 810, 818 (6th Cir. 2005) (citing *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)). The Sixth Circuit has explained that in order to make out a case of selective enforcement, the plaintiff "must establish that the challenged police action 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Ibid.* (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Discriminatory effect may be evidenced by "showing similarly situated individuals . . . were treated differently through statistical evidence or identifying a person of another [class] who the police treated differently." *Ibid.* A plaintiff may demonstrate discriminatory purpose by offering "evidence that an official chose to prosecute or engage in some other action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Ibid.* (internal citations and quotation marks omitted).

An Equal Protection analysis based on a theory of selective enforcement generally is framed in terms of racial or other protected-class discrimination. Nonetheless, the Fourteenth Amendment has been interpreted by the Supreme Court to "embod[y] the general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799 (1997). In this case, however, there is no evidence that the plaintiffs were treated differently than other citizens. The affidavit upon which the plaintiffs rely and the attached photographs neither state nor depict that others were treated more favorably than they. Moreover, there is no evidence of any discriminatory purpose on part of the defendants. The Court therefore finds that the plaintiffs' first objection lacks merit.

B.

The plaintiffs next challenge the magistrate judge's conclusion that the ordinance at issue was supported by a legitimate governmental interest and that the terms of the ordinance were rationally related to such interest. The plaintiffs believe that their property rights to keep disabled vehicles must yield to the City's ordinance unless there is "grave and immediate danger against which the state lawfully may protect." Pls.' Obj. at 3. They cite *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1944), in support.

That contention is not well-founded. *Barnette* was a First Amendment case discussing free speech rights in which the Supreme Court noted the difference between such rights and other, non-fundamental rights. 319 U.S. at 639 (reasoning "the right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect"). Speech rights are not involved in this case.

`      The plaintiffs further argue that the magistrate judge incorrectly relied on the Eighth Circuit's decision in *Davis v. Norman*, 555 F.2d 189 (8th Cir. 1977), for the proposition that an abandoned vehicle ordinance was rationally related to a legitimate governmental purpose. The automobile in that case, the plaintiffs contend, was wrecked, but their vehicles were operational. In addition, the plaintiffs state, the court in *Davis* made no mention of the definition of a disabled vehicle, which under the Bay City code is defined as any vehicle that fails to display a current

license plate.  Finally, the plaintiffs note that *Davis* arose under the First Amendment and the issue here is whether the plaintiffs may park a vehicle in their back or side yards.

The plaintiffs mistake the import of the magistrate judge's citation to *Davis*.  The magistrate judge reasoned that if the ordinance at issue in that case, which "prohibited the unenclosed storage of abandoned, wrecked, or inoperable motor vehicles on . . . private property for more than 15 days, and authorized the police to remove such vehicles [after notice was given]" *id.* at 190, could pass muster under the First Amendment, then Bay City's ordinance, subject only to rational basis review, surely  was constitutionally valid.  The magistrate judge's conclusion is sound; the distinctions the plaintiffs make between this case and *Davis* are immaterial.

The plaintiffs believe that the magistrate judge should have given controlling weight to *City of Flint v. Bibbs*, No. 52759 (Mich. Ct. App. April 26, 1982), an unpublished Michigan Court of Appeals case.  As the magistrate judge noted, the court in *Bibbs* held that

> [Flint's] ordinance bears no real or substantial relationship to public health, morals, safety or general welfare insofar as it concerns automobiles that merely are inoperative or lacking current license plates.  Such automobiles pose no threat to public health or safety and because the challenged ordinance prohibits persons from permitting such vehicles to remain on the property for more than 15 days, is unconstitutionally overbroad.

*Bibbs*, slip op. at 3-4.  However, *Bibbs* construed Michigan's constitution, not federal law.  Further, as the magistrate judge recognized, the court of appeals did not reproduce the language of the ordinance at issue, and a comparison with the Bay City ordinance therefore is not possible.  More compelling is the magistrate judge's assessment that

> [t]here is some indication that the Flint Ordinance prohibited such vehicles from being located anywhere on Flint resident's property for more than 15 days, based upon the court's note that defendant Bibbs orally moved to dismiss at the trial court level because he "had a right to put his cars in his driveway."  In light of this argument, one can infer that the Flint ordinance was found to be overbroad because

-6-

it prohibited the presence of such vehicles *anywhere* on the a Flint resident's property.

R & R at 11 (emphasis added) (citations omitted). As the magistrate judge observed, the statute in *Bibbs* likely is materially distinguishable from the ordinance at issue here because the Bay City ordinance prohibits only the storage of vehicles that are unlicensed or incapable of self-propulsion, in side and back yards of property zoned residential, for more than ten days.

The plaintiffs also complain that the City has failed to produce evidence of a rational relationship between the challenged ordinance and a legitimate governmental interest. They state "[t]he Defendant City has provided no evidence as to the effect a motor vehicle without a current license plate has that is different from a recreational vehicle without a current license plate." Pl.s' Obj. at 5.

The Equal Protection Clause of the Fourteenth Amendment provides that a state actor shall not "deny to any person within its jurisdiction, the equal protection of the laws." As a general rule, the Fourteenth Amendment does not prohibit a municipality from exercising its police powers based on classifications. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *Peoples Rights Organization, Inc. v. City of Columbus,* 152 F.3d 522, 531 (6th Cir. 1998). "It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Peoples Rights*, 152 F.3d at 531. Therefore, if a municipal ordinance "does not burden a fundamental right or target a suspect classification, it will withstand constitutional scrutiny so long as it bears a rational relationship to a legitimate state interest." *Ibid.*

The Sixth Circuit has explained that "[a]n ordinance which represents an exercise of the municipality's police powers is presumed to be constitutionally valid, with the burden of showing unreasonableness being cast upon those who challenge the ordinance." *Curto v. City of Harper*

*Woods,* 954 F.2d 1237, 1243 (6th Cir. 1992) (citing *Goldblatt v. Hempstead*, 369 U.S. 590, 595-96 (1962)).   That presumption applies when a municipality moves for summary judgment. Consequently, "if the undisputed facts and relevant presumptions are such that the moving party would be entitled to a directed verdict at trial, he will be entitled to summary judgment under Rule 56, unless the opposing party offers evidence of a substantial character rebutting the presumption or presents good reasons, in accordance with Rule 56(f), for a failure to offer such evidence." *Ibid.* (quoting *Wermager v. Cormorant Township Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983)).

The plaintiffs failed to meet their burden on a motion for summary judgment.   It is well established that a municipality validly may impose regulations on motor vehicle use and storage based on concerns of public safety and property value.  *See Fertilinz Co. v. Hyde Park*, 97 U.S. 659 (1878); *Tower Reality, Inc. v. City of Detroit*, 196 F.2d 710, 723 (6th Cir. 1952).  The plaintiffs do not dispute this statement of the law.  Rather, they believe that the different treatment of recreational vehicles and conventional motor vehicles is irrational.  That theory was never presented to the magistrate judge in the first instance.

Even if it were, the reference to other portions of the ordinance that allow an owner to store his recreational vehicle in the back yard does not condemn the ordinance to irrationality.  Rational distinctions exist that commend themselves to legislative consideration and judgment.  For example, it is apparent that recreational vehicles are different than conventional motor vehicles: they are used less frequently and current licensing may be less of a concern.  As the defendants point out, the sections governing recreational vehicles require that they be kept in operating condition.  Further, the ground underneath such a stored vehicle must be surfaced to avoid muddy conditions.  The mere fact that different vehicles are treated differently does not amount to "evidence of a substantial

character" that "rebut[s] the presumption" of constitutionality. *Curto*, 954 F.2d at 1243. Because the plaintiffs have not come forward with evidence that rebuts the presumption of constitutionality, the Court will overrule the plaintiffs' second objection.

C.

The plaintiffs next take issue with the magistrate judge's determination that the ordinance was not unconstitutionally vague. The plaintiffs argue that the ordinance leaves undefined key terms such as "store," "park," and "occupant" They also challenge the construction of the term "inoperable" and contend that their conviction for the ordinance violation was based on the officers' "assumptions" that the vehicles were "inoperative."

In *Deja Vu of Cincinnati, L.L.C. v. Union Tp. Bd. of Trustees,* 411 F.3d 777, 798 (6th Cir. 2005), the Sixth Circuit explained:

> "[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (holding that Rockford's antinoise ordinance was not unconstitutionally vague). Vague laws are problematic because they (1) "may trap the innocent by not providing fair warning,' (2) fail to "provide explicit standards for those who apply them," and (3) threaten "to inhibit the exercise of [First Amendment] freedoms." *Id.* at 108-09 (quotation marks and footnote omitted). A law must therefore "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 108
>
>  The Supreme Court has explained that, '[c]ondemned to the use of words, we can never expect mathematical certainty from our language.' *Id*. at 110, 92 S.Ct. 2294.

An examination of the ordinance challenged in this case leads to the unavoidable conclusion that a person of ordinary intelligence would understand what conduct is prohibited. The ordinance states:

Sec. 74-203 Storage or repair in side or rear yards

-9-

(a) Unless otherwise provided in this Code, no owner and/or occupant of real estate shall permit a disabled motor vehicle to be stored or repaired in the side or rear yard, as defined in chapter 122 of this Code of any lot or land zoned residential or office for a period in excess of ten days and, in any event, no more than one vehicle shall be allowed to be so stored or repaired in any ten-day period.

Compl. Ex. A, Article IX, Bay City Code of Ordinances. The ordinance defines a disabled motor vehicle as "any motor vehicle, or parts thereof, whether assembled or not, which is incapable of being self-propelled or which does not meet the requirements for operation upon the public streets." *Id.* at § 74-201.

The plaintiffs claim that they were "parking" their vehicles, not "storing" them. This distinction, however, does not render the ordinance vague. The prohibition is still clear: an individual cannot keep (either "parked" or "stored") a vehicle in a back or side yard for more than ten days if that vehicle is either incapable of self-propulsion or not properly licensed. Presumably, the plaintiffs seek to invoke a *temporal* connotation with respect to the term "parking" as opposed to the more *permanent* practice of "storing" a motor vehicle. Under the plain terms of the ordinance, that distinction carries no difference of any significance. If vehicles are operable and licensed, they may be "parked" or "stored" without running afoul of the ordinance. If the plaintiffs' vehicles were both licensed and operable, then they had a defense to the ordinance violation they could have offered at trial in State court. Similarly, the plaintiffs' argument that the officers incorrectly "assumed" that the vehicles were inoperative because they appeared not to have been moved for some time attacks the sufficiency of the evidence offered at the State trial. None of these arguments undermine the constitutionality of the ordinance, and this Court does not review the State trial proceedings as if on appeal. *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983) (holding that federal court review of

-10-

state court proceedings is jurisdictionally limited to the Supreme Court of the United States by 28 U.S.C. § 1257); *see also Anderson v. Charter Twp. of Ypsilanti*, 266 F.3d 487, 492 (6th Cir. 2001) (noting that the *Rooker-Feldman* doctrine stands for the "simple . . . proposition that lower federal courts do not have jurisdiction to review a case litigated and decided in state court; only the United States Supreme Court has jurisdiction to correct state court judgments").

The plaintiffs' remaining definitional nitpicks likewise attack the application of the ordinance to the facts of their case. The complain that they were not occupants of the property and did not own the vehicles. That argument does not render the ordinance vague; it challenges the way in which the ordinance was enforced and the case proved by the defendants in the State court. Finally, they admit that the definition of "inoperable is clear enough[.]" Pl.s' Obj. at 6.

The Court finds that the section 74-205 of the Bay City Code of Ordinances provides a person of average intelligence notice of the conduct that is prohibited. As the magistrate judge reasoned, the ordinance's "language leaves no doubt in the mind of a person of ordinary intelligence and provides fair warning that it is referring to vehicles that either won't run or can't legally be operated on the public streets . . . . A person of ordinary intelligence . . . would understand from this language that if they have a vehicle that breaks down and needs repair, it can be placed in a side or rear yard so long as the vehicle only remains in that location for a maximum time of 10 days." R & R at 15. The Court therefore will overrule the plaintiffs' third objection.

### D.

In addition to objecting on vagueness grounds, the plaintiffs also argue that the ordinance is overbroad. The magistrate judge concluded that because there was at least one set of

-11-

circumstances under which the ordinance could be applied constitutionally, the ordinance passed muster.

Generally, a challenge to an ordinance on overbreadth grounds can be sustained only in a First Amendment case. *See, e.g., United States v. Salerno*, 481 U.S. 739, 745 (1987) (clarifying that "we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment"). The magistrate judge, however, noted that the Second Circuit has extended the doctrine beyond the First Amendment, albeit in a limited way. In *United States v. Rybicki,* 354 F.3d 124, 130-31 (2d Cir. 2003), the court of appeals reasoned that "a statute can be held facially unconstitutional even if the challenge is not raised under the First Amendment." But the court explained, "the test for facial unconstitutionality then is whether any set of circumstances exist under which the statute in question would be valid." *Ibid.* Even assuming such a challenge could be made in this case, no constitutional implications arise because the ordinance plainly can be applied in a constitutional manner.

The plaintiffs attempt to cast the law in different terms. They argue that the "issue before the  [magistrate judge] was whether that same set of circumstances would often be entirely innocuous and therefore render the ordinance unconstitutional." Aside from misstating the law, the case to which they cite, *Lazarus v. Faircloth*, 301 F. Supp. 266 (D. Fla. 1969), offers no support. First, the case has been reversed. *See Shevin v. Lazarus,* 401 U.S. 987 (1971). Second, *Lazerus* involved an invalid and antiquated criminal vagrancy statute and was found unconstitutional because it could be used to punish visitors who came to Florida to enjoy the climate and beaches for standing about and enjoying those things. The ordinance in this case prohibits individuals from keeping disabled vehicles in side and rear yards for longer than ten days. Ultimately, the plaintiffs do not

appear to dispute the magistrate judge's conclusion that the challenged ordinance can be applied constitutionally under one at least one set of circumstances, and the Court therefore finds that the plaintiffs' fourth objection lacks merit.

E.

The plaintiffs next object to the magistrate judge's conclusion that no Fourth Amendment violation occurred in this case. The magistrate judge concluded that the plaintiffs had no expectation of privacy in the lot adjoining their home on which they kept their vehicles. He reasoned that the

> Plaintiffs in this case have not asserted an expectation of privacy which society is prepared to recognize as reasonable. I suggest that society would find it unreasonable for a property owner to store his or her unlicensed vehicles for an extended period of time on a parcel of property [that] is owned by the City of Bay City, and then charge Bay City's own police officers with trespass and Fourth Amendment violations for walking onto property, not to seize the vehicles, but merely to obtain the VINs for purposes of enforcing a . . . nuisance ordinance.

R & R at 23.

The plaintiffs claim that they are in fact the owners of the adjacent lot. They attach a deed to their objections, but there is no plain language description or affidavit attached that would permit the Court to determine that the disputed property was owned by the plaintiffs. However, even assuming that the plaintiffs owned the lot, no search likely occurred, as the magistrate judge concluded.

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and [that] no Warrants shall issue, but upon probable cause . . . ." The Sixth Circuit has explained that "[t]he Fourth Amendment's protections hinge on the occurrence of a 'search,' a legal

-13-

term of art whose history is riddled with complexity." *Widgren v. Maple Grove Tp.*, 429 F.3d 575, 578 (6th Cir. 2005) (citing *Kyllo v. United States*, 533 U.S. 27, 32 (2001)). Whether a search occurs is made in reference to an individual's "reasonable expectation of privacy."

The Supreme Court's decision in *Katz v. United States*, 389 U.S. 347 (1967), sets forth the appropriate inquiry. First, the court must ask "has the individual manifested a subjective expectation of privacy in the object of the challenged search?" Then, the court must determine whether society "is society willing to recognize that expectation as reasonable[.]" *Widgren*, 429 F.3d at 578 (citations omitted). Two considerations are present in the second part of the *Katz* test:

> The first focuses on what a person had an expectation of privacy in, for example, a home, office, phone booth or airplane. This inquiry centers on whether the human relationships that normally exist at the place inspected are based on intimacy, confidentiality, trust or solitude and hence give rise to a "reasonable" expectation of privacy.
>
> The second consideration examines what the person wanted to protect his privacy from, for example, non-family members, non-employees of a firm, strangers passing by on the street or flying overhead in airplanes. This inquiry, therefore, focuses on the government intrusion at issue.

*Id.* at 578-79.

The so-called "open fields" and "curtilage" doctrines have given shape to *Katz*'s second prong and have established "some bright line rules" in the Fourth Amendment context. *Id.* at 579. For example, there is no reasonable expectation of privacy in an open field. *Ibid.* As the Supreme Court has explained, this doctrine "was founded upon the explicit language of the Fourth Amendment," which by it terms limits protection to "persons, houses, papers, and effects[.]" *Oliver v. United States*, 466 U.S. 170, 177 (1984). The distinction between a field and the house "is as old as the common law." *Ibid.* (citations and quotations omitted).

-14-

What constitutes an open field, however, is not necessarily intuitive. "The term 'open fields' is somewhat of a misnomer in that '[a]n open field need be neither "open" nor a "field"' and 'may include any unoccupied or undeveloped area outside of the curtilage. . . . [T]here is no constitutional difference between police observations conducted while in a public place and while standing in the open fields.'" *Widgren*, 429 F.3d at 579 (quoting *United States v. Dunn*, 480 U.S. 294, 304 (1987); *Oliver*, 466 U.S. at 183-84). In *Widgren*, for example, the Sixth Circuit considered whether municipal zoning and tax officials violated the Fourth Amendment when they inspected the plaintiffs' property. The plaintiffs in that case owned twenty acres of largely undeveloped land in a rectangularly shaped lot. Trees, hills, and overgrowth covered the property. At some point, the plaintiffs began building a house. They cleared the area immediately surrounding the house, routinely mowed, dug a fire pit, pruned trees, and installed a picnic table among other things.

The property was connected to the outside world by "over one thousand feet of dirt driveway winding through 'swampy and thick' terrain, a row of pine trees and a rye field[.]" *Widgren*, 429 F.3d at 577. Apparently, at the mouth of the driveway, there was a large metal gate on which the plaintiffs had affixed several no trespassing signs, one of which warned "federal officers of the IRS, HEW, HUD, environmental, health, and other unconstitutional agencies as well as all local members of planning & zoning boards of a $5,000 per person land use fee." *Id.* at 578 (internal quotation marks omitted). The plaintiffs never obtained a permit to build the house, and as a result the municipal officials identified above entered the property three times to confirm the zoning violation, post a civil infraction on the front door of the house, and to conduct a tax assessment by observing the exterior of the house.

The Sixth Circuit examined the three alleged instances separately under the Fourth Amendment.  The first occurred when the zoning administrator was driving near the plaintiffs' home, where he observed a reflection from a window of the home.  The administrator was confident that no land use permit had been issue for that area.  He approached the plaintiffs' property and proceeded past the no trespassing sign.  He came within two hundred feet of the house but did not set foot on the cleared area.  The administrator then returned to his municipal office, confirmed no land use permit had issued, and wrote the plaintiffs' a letter informing them of the violation.  The court of appeals easily concluded that although a search occurred, it was reasonable because "no expectation of privacy exists in open fields." *Id.* at 579 (internal citation omitted).  It reasoned that the administrator did not enter the curtilage of the home, demarcated by the cleared area, and  "[t]he presence of a 'No Trespassing' signs, furthermore, does not transform the open fields into an area where an expectation of privacy is necessarily reasonable." *Id.* at 580 (internal citation omitted).

The second instance occurred when the zoning administrator returned to the property several weeks later and posted the civil infraction.  The Sixth Circuit again concluded that no search had occurred.

> A search generally implies looking over or through for the purpose of finding something.  According to one court, a search may occur even where the officer was not intentionally looking for something, so long as "the objective effect of his actions" infringed a reasonable expectation of privacy. *United States v. Maple*, 348 F.3d 260, 263 (D.C. Cir. 2003)
> . . .
>   In the instant situation . . . , objectively speaking, nothing was looked for and nothing was found, except the existence of a structure.  Mr. Lenz merely posted a citation in his capacity as the Township's zoning administrator and did not seek to discover incriminating evidence.  Moreover, the intrusion here was even more minimal than in [other cases] because Mr. Lenz never set foot in the house.  In his second visit to the Widgren property, Mr. Lenz, therefore, did not conduct a Fourth Amendment search.

*Id.* at 580-81.

The third instance, the court of appeals explained, presented a closer question. In that circumstance, the municipal tax assessor walked onto the plaintiffs' property and approached the house by way of the cleared area. He observed the house's exterior, measured it by counting the foundation of cement blocks, and took photographs of the house. The assessor never came within more than four feet of the house and left shortly thereafter. The court of appeals first found that the assessor had intruded into the curtilage of the plaintiffs' home.

> The *Dunn* court established four factors for determining whether an area is a home's curtilage: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.* at 301
> . . .
> [W]e conclude that the cleared area immediately surrounding the house constituted curtilage. First, the area . . . lay within immediate proximity to the house, only four to six feet away, unlike the area in *Dunn* that was located sixty yards from the house. Second, although the area was not within an enclosure, a clear line marked the mowed portion from the surrounding area that had not been cleared. Third, the cleared area had apparently been used for the activities and privacies of domestic life" manifested by the presence of a picnic table, a fire pit, and pruned trees. *See Dunn*, 480 U.S. at 303. Fourth, the Widgrens maintained a metal gate and "No Trespassing" signs to protect the area from observation by people passing by; although these measures may not have been enough in a more urban environment, erecting a fence likely would have added little privacy in this remote rural location.

*Id.* at 581-82.

Although the court found that the assessor encroached onto the curtilage of the plaintiffs' home, it nonetheless found that a search had not occurred within the meaning of the Fourth Amendment. In reaching its conclusion, the court of appeals assumed that the plaintiffs' had a subjective expectation of privacy, the first prong under *Katz*. However, the court was not prepared to find that expectation of privacy was one society was willing to recognize a reasonable.

-17-

> [The assessor's] actions were not unduly intrusive. He used naked-eye observations unaided by technological enhancements. His methods were not extraordinary in that, for example, he was not forced to contort his body unnaturally to survey the house, but instead merely counted the foundation cement blocks in plain view. No "dirty business" was transacted, and his observations occurred during the daytime. He did not touch, enter, or look into the house. Nor did he stray beyond areas reasonably necessary to aid his inspection. The most unsettling intrusion of Mr. Beldo, however, was his entry into the curtilage. Tax appraisers would be well advised to obtain consent or a warrant as a matter of course before breaching the curtilage because, in many instances, such an intrusion may be a Fourth Amendment search. Such invasions implicate the law of trespass, but not necessarily the Fourth Amendment.
>
> We, therefore, hold that, under the facts of this case, a property assessor does not conduct a Fourth Amendment search by entering the curtilage for the tax purpose of naked-eye observations of the house's plainly visible exterior attributes and dimensions-all without touching, entering or looking into the house.

*Id.* at 585-86 (citations omitted).

The Court believes that *Widgren* provides guidance and is applicable to the Fourth Amendment claims made by the plaintiffs in this case.

1.

In this case, the plaintiffs claim that open fields doctrine can have no application because the land at issue was developed. That statement of the law is plainly incorrect. *See Dunn*, 480 U.S. at 304 (stating that an open field may include any undeveloped *or* unoccupied area outside of the curtilage). The plaintiffs do not dispute that the land at issue is unoccupied: it is a vacant lot. The question is whether the vacant area is somehow within the curtilage of the home.

The magistrate judge described the property as "a vacant lot . . . . adjacent to Plaintiffs' residential property, and although Plaintiffs allege that certain sides of the property are fenced, there is nothing in the record to indicate that a fence encloses both Plaintiffs' property and the adjacent lot so that the officers would have had to scale a fence." R & R at 23. During the bench trial,

-18-

defendant officer Richard Roberts testified that the vehicles were parked "to the south of the actual residence in what looks like, used to be maybe a lot or a house had been in the past." Trial Transcript at 35. It is undisputed that no fence separated the street from which the vehicles could be viewed and the lot.

There is no evidence to suggest that the plaintiffs had a reasonable expectation of privacy in the lot. The plaintiffs claim that there was some fencing, but do not press the issue in their objections. They argue simply that the presence of fencing is not necessary for land to be considered curtilage. Although the plaintiffs are correct, few of the *Dunn* factors are present that would support a finding of curtilage in this case. First, the lot is described by the parties as adjacent, but there is no evidence of the measured distance to the residence. Second, it is undisputed that the lot is not "included within an enclosure surrounding the home." *Dunn*, 480 U.S. at 301. Unlike the plaintiffs' property in *Widgren* that was demarcated by the presence of a mowed lawn instead of a fence, the plaintiffs here can point to no such analogue. There is no evidence, for example, that the lot was even cleared like the property in *Widgren*.

Third, there is no evidence that lot was used for anything associated with human habitation. There was no picnic table, fire pit, pruned trees, or cleared area like the land in *Widren*. In other words, nothing in the record suggests that the area had "been used for the activities and privacies of domestic life[.]" *Dunn,* 480 U.S. at 303. Fourth, there does not appear to be any attempt by the plaintiffs to keep the area private. There was no gate leading on to the property or a no trespassing sign posted as there was in *Widgren*. The magistrate judge noted that nothing inhibited the defendants from walking onto the property and inspecting the vehicles. The plaintiffs claim that some fencing exists, but there is no indication of where the fencing was in relationship to the house

-19-

or whether the fencing served to make more private the adjacent lot.  Viewing the facts in the light most favorable to the plaintiffs, the Court must conclude that the plaintiffs had no reasonable expectation of privacy in the adjacent lot.  Even if one concludes that a search occurred, the search was reasonable as a matter of law.  The Court, therefore, will overrule the plaintiffs' fifth objection.

2.

The plaintiffs insist that the defendants unlawfully searched and seized the VIN of one of the vehicles for no reason.  They argue that the vehicle, a Thunderbird, was not in the adjacent lot; rather, it was "where the home was situated."  The plaintiffs, however, do cite to any record evidence or affidavit suggesting that this vehicle was located on property that could be considered within the curtilage.

Even assuming that the truth of the plaintiffs' statement, it appears that no Fourth Amendment violation occurred.  The officer's purpose and actions were to obtain a VIN to determine if the vehicle was registered.  Like the assessor in *Widgren*, the officer's "actions were not unduly intrusive. He used naked-eye observations unaided by technological enhancements. His methods were not extraordinary in that, for example, he was not forced to contort his body unnaturally to survey the [vehicle], but instead merely [observed the VIN plainly displayed behind the windshield].  No 'dirty business' was transacted, and his observations occurred during the daytime. He did not touch, enter, or look into the [vehicle]. Nor did he stray beyond areas reasonably necessary to aid his inspection." *Widgren*, 429 F.3d at 585-86.  It appears "objectively speaking, nothing was looked for and nothing was found, except the existence of a [VIN]" and no unconstitutional search therefore occurred. *Id.* at 581.

-20-

Moreover, VINs generally are considered to be in plain view, outside the Fourth Amendment's reach. *New York v. Class*, 457 U.S. 106, 118 (1986) (reasoning that the VIN "is by law present in one of two locations – either inside the door jam, or atop the dashboard and thus ordinarily in plain view of someone outside of the vehicle. Neither of these locations is subject to a reasonable expectation of privacy"). The Court therefore finds that no Fourth Amendment violation occurred on this theory.

F.

The plaintiffs take issue with the magistrate judge's conclusion that the Ninth Amendment does not independently secure a constitutional right for purposes of a section 1983 claim. The plaintiffs are correct that the Ninth Amendment has been used as the foundation for a right of privacy. However, the magistrate judge was correct: an alleged violation of the Ninth Amendment itself does not give rise to an independent cause of action. *See Strandberg v. City of Helena*, 791 F.2d 741, 748 (9th Cir. 1986). The Court will therefore overrule the plaintiffs' sixth objection.

G.

The plaintiffs' final objection is that they were deprived of their rights under color of law when the defendants (1) sent two cars squad cars and four officers to serve the ordinance citation; (2) put on bullet proof vests to serve the citation; (3) interrogated the plaintiffs about the Michigan militia; and (4) tagged and threatened to tow vehicles. The plaintiffs, however, do not explain which rights were violated, provide case law in support of these claims, or cite to the record to develop a factual basis. It does not appear that these claims were made in their complaint or specifically presented to the magistrate judge in the first instance. The Court, therefore, will not consider them now. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528 (6th Cir. 2000) (holding that "the

-21-

Commissioner cannot rely on any waiver by Heston to foreclose consideration of her claims on the merits, because the Commission failed to bring Heston's waiver to the attention of the Magistrate Judge").  The Court therefore will overrule the plaintiffs' final objection.

III.

After conducting a *de novo* review of the record in light of the plaintiffs' objections, the Court is satisfied that the defendants' motion for summary judgment should be granted.  The magistrate judge correctly applied the law and the plaintiff's objections lack merit.

Accordingly, it is **ORDERED** that the magistrate judge's report and recommendation is **ADOPTED** and the plaintiffs' objections are **OVERRULED**.

It is further **ORDERED** that the defendants' motion to dismiss or for summary judgment [dkt # 15] is **GRANTED**.

It is further **ORDERED** that the plaintiffs' federal claims are **DISMISSED WITH PREJUDICE** and the plaintiffs' claims arising under state law are **DISMISSED WITHOUT PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 9, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 9, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS

---